**WITTELS MCINTURFF PALIKOVIC**
Daniel J. Kieselstein
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Tel:    914-775-8862
djk@wittelslaw.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **KRISTIN ADAMIEC,**<br><br>On Behalf of Herself and All Others Similarly Situated,<br><br><div align="center">**Plaintiff,**</div><br><div align="center">**v.**</div><br>**ASANA REBEL GMBH**,<br><br><div align="center">**Defendant.**</div> | Case No.:  25-cv-10358<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kristin Adamiec ("Plaintiff"), by her undersigned attorneys Wittels McInturff Palikovic, brings this consumer protection action in her individual capacity and on behalf of a class of Illinois consumers defined below against Defendant Asana Rebel GmbH (hereinafter, "Asana Rebel," "Defendant," or the "Company") and hereby alleges the following with knowledge as to her own acts and upon information and belief as to all other acts:

## **INTRODUCTION**

1.  This proposed class action lawsuit challenges Asana Rebel's use of deceptive and illegal "automatic renewal" tactics to trick consumers into paying for unwanted app-based health and fitness subscriptions ("Asana Rebel Subscriptions"). Asana Rebel intentionally misleads consumers into thinking that they can subscribe for a discrete period of time. The truth, however, is that the Asana Rebel Subscriptions automatically renew and the Company's "disclosures" regarding the ongoing charges are hidden from consumers both before and after purchase. Asana Rebel's enrollment and post-purchase practices therefore violate the Illinois Automatic Contract Renewal Act (815 ILCS 601/1 *et seq.*, ("Illinois ARL")) and the common law. Further, Asana Rebel intentionally makes the Asana Rebel Subscriptions difficult to cancel. This too violates the Illinois ARL and the common law.

2.  Asana Rebel offers consumers a "healthy lifestyle" app, also called "Asana Rebel." Paid access to the app purports to provide "100+ Inspired Fitness workouts," a "variety of healthy and nutritious recipes," and "calming sounds and guided meditations."

3.  Potential customers are directed to Asana Rebel's website through online searches, its sponsorship of influencers, or the Company's advertising. Asana Rebel advertises widely online. Asana Rebel's advertising touts the benefits that its service allegedly offers; for example,

1

the Company claims that it promotes a "healthy lifestyle for everyone" and that it can help people "Get in shape. Stay healthy."

4.      But while consumers enroll in Asana Rebel Subscriptions to pursue a healthier lifestyle, Defendant is actually collecting consumers' payment information and hard-earned money for use in its deceptive and unlawful subscription practices. These practices are intentionally designed to trick consumers into paying unwanted subscription fees. Indeed, that is exactly what happened here, where Plaintiff enrolled in an Asana Rebel Subscription that she did not know would automatically renew and was then charged for an additional year of the Asana Rebel Subscription that she did not want.

5.      Asana Rebel Subscriptions use a "negative option" billing tactic, which the Consumer Financial Protection Bureau ("CFPB") defines as "a term or condition under which a seller may interpret a consumer's silence, failure to take an affirmative action to reject a product or service, or failure to cancel an agreement as acceptance or continued acceptance of the offer."[1] As the CFPB cautions, "[n]egative option programs can cause serious harm to consumers," which "is most likely to occur when sellers mislead consumers about terms and conditions, fail to obtain consumers' informed consent, or make it difficult for consumers to cancel."[2]

6.      Due to the Company's deceptive and unlawful negative option practices, many consumers who sign up for Asana Rebel's product offerings end up being illegally charged for Asana Rebel Subscriptions.

---

[1] Consumer Financial Protection Circular 2023-01, Unlawful negative option marketing practices (Jan. 19, 2023), https://files.consumerfinance.gov/f/documents/cfpb_unlawful-negative-option-marketing-practices-circular_2023-01.pdf.

[2] *Id*. at 2.

## THE UNIFORM WEB OF ASANA REBEL'S NEGATIVE OPTION SCHEME

7.      Asana Rebel traps consumers into unintended purchases with a web of deceptive online design features that exploit well-known shortcomings in consumer decision-making. The paragraphs below describe the various deceptive strategies Asana Rebel employs in the structure of its offerings. While each of the deceptive strategies is independently sufficient to trick consumers into making inadvertent purchases, taken together these components work together to form an intentionally deceptive architecture that is designed to, and does, produce an unlawful outcome: saddling unwitting consumers with illegal subscriptions.

8.      Asana Rebel's subscriptions are deceptive and illegal in at least four ways.

9.      First, during the enrollment process, Asana Rebel misleads consumers regarding the fact that Asana Rebel Subscriptions automatically renew, the terms of any such automatic renewal, and the cancellation policy that applies to Asana Rebel's offer. For example, instead of clearly explaining to the consumer what they are actually getting into, Asana Rebel offers consumers what appear to be time-limited plans and withholds the relevant (and inadequate) terms that reveal otherwise. Asana Rebel waits until a customer reaches the payment step in its sign-up process and then includes inadequate "disclosures" regarding its recurring fees in multiple locations on the page, designed in a way such that consumers overlook it. Instead of alerting consumers to these facts and then obtaining their informed and affirmative consent to automatic renewal prior to charging their payment cards or third-party payment accounts, Asana Rebel hides the truth.

10.      Second, Asana Rebel's acknowledgement emails sent to consumers after they enroll in an Asana Rebel Subscription do not clearly and conspicuously disclose how to cancel an

Asana Rebel Subscription using a cost-effective, timely, and easy-to-use mechanism, in violation of Illinois law.

11.    Third, Asana Rebel makes canceling Asana Rebel Subscriptions exceedingly difficult. Customers must figure out—on their own—that canceling requires navigating an unnecessarily long and intentionally confusing process involving at least eight separate actions across at least six different pages on the Company's *website*, despite the fact that consumers can only access Asana Rebel's offerings through the Company's *app*.

12.    Fourth, on information and belief, Asana Rebel failed to send consumers notice of upcoming autorenewal payments, in violation of Illinois law.

13.    All Asana Rebel customers face this same gauntlet and need only be tricked by one of Asana Rebel's traps to end up paying a hefty fee for an unwanted subscription.

14.    It is not happenstance that so many of Asana Rebel's customers are paying for illegal subscriptions. This outcome is the desired result of Asana Rebel's intentional and bad-faith design choices. Asana Rebel knows its scheme is tricking customers as hundreds of consumers have complained directly to Asana Rebel or via sites like Trustpilot, SiteJabber, and Reddit. Upon information and belief, Asana Rebel experiences a high rate of chargebacks from consumers disputing unwanted charges caused by Asana Rebel's subscription scheme, and it has developed customer service protocols specifically to deal with these complaints.

15.    Despite the clear messages Asana Rebel's customers are sending, the Company continues to subject consumers to its unlawful subscription scheme and to reap significant monetary benefits from its misconduct.

16.    Only through a class action can consumers like Plaintiff remedy Asana Rebel's unlawful practices. Because the monetary damages suffered by each customer are small in

comparison to the much higher cost a single customer would incur in trying to challenge Asana Rebel's improper conduct, it makes no financial sense for an individual customer to bring his or her own lawsuit. Furthermore, many customers do not realize they are victims of Asana Rebel's unlawful acts and continue to be charged to this day. With this class action, Plaintiff and the Class seek to level the playing field, enjoin Asana Rebel's unlawful business practices, and recover the charges Asana Rebel has imposed on them in violation of the law.

## JURISDICTION AND VENUE

17.     This Court has personal jurisdiction over Defendant because it conducts substantial business in Illinois, has sufficient minimum contacts with Illinois, and otherwise purposely avails itself of the privileges of conducting business in Illinois by marketing and selling products and services in Illinois. Further, the injuries to Illinois consumers that Plaintiff seeks to prevent through public injunctive relief arise directly from Asana Rebel's continuing conduct in Illinois, including, but not limited to, directing its subscription scheme at Illinois consumers.

18.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Asana Rebel.

19.     This Court has original subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act. However, if the Court determines that it lacks original jurisdiction over any claim in this action, it may exercise supplemental jurisdiction over Plaintiff's claims under 28 U.S.C. § 1367 because all of the claims arise from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

20.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(c)(3). Defendant is a foreign corporation and may be sued in any judicial district in the United States. *Id.*

## PARTIES

21.      Plaintiff Kristin Adamiec is a citizen of Illinois.

22.      Plaintiff is a consumer who was victimized by Asana Rebel's unlawful subscription scheme, suffered ascertainable injury in fact, and lost money because of Asana Rebel's violations of consumer protection statutes and the common law.

23.      Defendant Asana Rebel GmbH is a German corporation incorporated under the laws of Germany. Defendant's principal place of business is in Berlin, Germany.

## FACTUAL ALLEGATIONS

### A.      Background on the Subscription e-Commerce Industry

24.      The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[3] Subscription e-commerce services target a wide range of customers and cater to a variety of specific interests. Given the prevalence of online and e-commerce retailers, the popularity of subscription e-commerce has grown rapidly in recent years. Indeed, as of 2022 the "subscription economy ha[d] grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[4]

---

[3] *See* Sam Saltis, *How to Run an eCommerce Subscription Service: The Ultimate Guide*, CORE DNA, https://www.coredna.com/blogs/ecommerce-subscription-services.

[4] Mary Mesienzahl, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it*, BUSINESS INSIDER (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

25.     In March 2023, one source noted that "[o]ver the past 11 years, subscription-based companies[] have grown 3.7x faster than the companies in the S&P 500."[5]

26.     The expansion of the subscription e-commerce market shows no signs of slowing. According to The Washington Post, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] . . . The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last."[6] 68% of consumers subscribed to something for the first time in 2024.[7]

27.     However, the subscription-based business model also has well-documented downsides. While the subscription e-commerce market has low barriers to entry, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[8] In particular, retailers struggle with the fact that "[c]hurn

---

[5] *The Subscription Economy Index*, ZUORA (Mar. 2023), https://www.zuora.com/wp-content/uploads/2023/03/Zuora_SEI_2023_Q2.pdfhttps://www.zuora.com/resources/subscription-economy-index/.

[6] Heather Long and Andrew Van Dam, *Everything's becoming a subscription, and the pandemic is partly to blame*, WASHINGTON POST (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/.

[7] Tien Tzuo, *They said subscriptions were doomed. The market said otherwise.*, ZUORA (Mar. 6, 2025), https://www.zuora.com/subscribed/they-said-subscriptions-were-doomed-the-market-said-otherwise.

[8] Tony Chen *et al.*, *Thinking inside the subscription box: New research on e-commerce consumers*, MCKINSEY & COMPANY (Feb. 9, 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[9]

28.     Retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[10] As these companies have realized, "[t]he real money is in the inertia."[11] As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[12] That is, to garner more revenue, some companies, including Asana Rebel, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans. They do this by intentionally confusing users with their app's design and flow, . . . and other misleading tactics[,]" such as failure to fully disclose the terms of its automatic-renewal programs.[13]

29.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a

---

[9] *Id.*

[10] Amrita Jayakumar, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets*, WASHINGTON POST (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[11] *Id.*

[12] Zoe Schiffer, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want*, BUSINESS INSIDER (June 25, 2019), https://www.businessinsider.com/dark-patterns-online- shopping-princeton-2019-6.

[13] Sarah Perez, *Sneaky subscriptions are plaguing the App Store*, TECHCRUNCH (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store.

subscription marketing plan."[14] Indeed, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to combat aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[15] Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts, [and are] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[16] widespread utilization of these misleading "dark patterns" and deliberate omissions persist.

30.     The term "dark patterns" used herein is not a science fiction reference, but a term of art from the field of user experience ("UX"). The International Organization for Standardization defines UX as a "person's perceptions and responses that result from the use or anticipated use of a product, system or service."[17] Dark patterns in UX are "carefully designed misleading interfaces by UX design experts that trick the users into choosing paths that they didn't probably want to take, thus fulfilling the business objectives, completely ignoring the requirements and ethics of users."[18]

---

[14] Heather Long and Andrew Van Dam, *supra* note 6 ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also The problem with subscription marketing*, NEW MEDIA AND MARKETING (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing.

[15] *Id*.

[16] *Id.*

[17] *User Experience (UX): Process and Methodology*, UIUX TREND, https://uiuxtrend.com/user-experience-uxprocess/.

[18] Joey Ricard, *UX Dark Patterns: The Dark Side Of The UX Design*, KLIZO SOLS. PVT. LTD. (Nov. 9, 2020), https://klizos.com/ux-dark-patterns-the-dark-side-of-the-ux-design.

31.     The term "dark patterns" was first coined by cognitive scientist Harry Brignull, who borrowed from existing UX terminology. In UX, designers refer to common, re-usable solutions to a problem as a "design pattern," and conversely to common mistakes to solutions as "anti-patterns."[19] The term "dark patterns" was intended to "communicate the unscrupulous nature" of the design "and also the fact that it can be shadowy and hard to pin down."[20] The below image provides some examples of commonly employed dark patterns:[21]



---

[19]   Harry Brignull, *Bringing Dark Patterns to Light*, MEDIUM (June 6, 2021), https://harrybr.medium.com/bringing-dark-patterns-to-light-d86f24224ebf.

[20] *Id.*

[21] Sarbashish Basu, *What is a dark pattern? How it benefits businesses- Some examples*, H2S MEDIA (Dec. 19, 2019), https://www.how2shout.com/technology/what-is-a-dark-pattern-how-it-benefit-businesses-with-some-examples.html.

32.     The origin of dark patterns can be traced to the use of applied psychology and A/B testing in UX.[22] In the 1970s, behavioral science sought to understand irrational decisions and behaviors and discovered that cognitive biases guide all our thinking. The below image provides examples of cognitive biases, including some that Asana Rebel employs in its cancellation process:[23]



---

[22] Brignull, *supra* note 19.

[23] Krisztina Szerovay, *Cognitive Bias — Part 2*, UX KNOWLEDGE BASE (Dec. 19, 2017), https://uxknowledgebase.com/cognitive-bias-part-2-fab5b7717179.

33.     But while the early behavioral research focused on understanding rather than intervention, later researchers, like Cass Sunstein and Richard Thaler (authors of the noted book *Nudge*) shifted focus and made the policy argument that institutions should engineer "choice architectures" in a way that uses behavioral science for the benefit of those whom they serve.[24]

34.     Another step in the development and application of such research is the use of A/B testing in UX. A/B testing is a quantitative research method that presents an audience with two variations of a design and then measures which actions they take (or do not take) in response to each variant.[25] UX designers use this method to determine which design or content performs best with the intended user base.[26] For example, a large health care provider might A/B test whether a website visitor is more or less likely to conduct a search of its doctors if the website's search function is labelled "SEARCH" versus simply identified by a magnifying glass icon.

35.     Unscrupulous UX designers have subverted the intent of the researchers who discovered cognitive biases by using these principles in ways that undermine consumers' autonomy and informed choice, and they used A/B testing to turn behavioral insights into strikingly "effective" user interfaces that deceive consumers in ways that are more profitable to the company applying them.[27] For example, dark patterns can be used to increase a company's

---

[24] Arvind Narayanan *et al.*, *Dark Patterns: Past, Present, and Future. The evolution of tricky user interfaces*, 18 ACM QUEUE 67-91 (2002), https://queue.acm.org/detail.cfm?id=3400901.

[25]     UXPin, *A/B Testing in UX Design: When and Why It's Worth It*, https://www.uxpin.com/studio/blog/ab-testing-in-ux-design-when-and-why.

[26] *Id.*

[27] Narayanan *et al.*, *supra* note 24.

ability to extract revenue from its users by nudging or tricking consumers to spend more money than they otherwise would, hand over more personal information, or see more ads.[28]

36.     Asana Rebel has engaged in these unlawful subscription practices with great success. The Company claims that it has over 700,000 active users,[29] and has received multiple rounds of investment from venture capital firms.[30]

**B.      Asana Rebel's Enrollment Process Violates the Illinois ARL**

37.     To enroll in an Asana Rebel subscription, consumers must navigate through an approximately 33-step sign up survey about their goals and habits. This process incorporates deliberate delay tactics, such as a faked period of connection to a database, but, upon information and belief, the lengthy survey does not result in a personalized wellness plan for the consumer and has no bearing on the offer presented to the consumer at the end for the sign-up process. Instead, the true purpose of the survey is to induce mental fatigue, leaving consumers less able to critically evaluate the information about future charges presented at the very end of the extensive sign-up process.

38.     Then, at the end of its enrollment process, Defendant scatters information about its Asana Rebel Subscriptions across two pages that individually and collectively fail to clearly and conspicuously disclose the automatic renewal offer terms in violation of the Illinois ARL.

---

[28] *Id.*

[29] Asana Rebel, https://asanarebel.com/en/giftcards/.

[30] Crunchbase, https://www.crunchbase.com/organization/asana-yoga.

39.     Upon information and belief, the first of the two pages displayed to consumers at the end of Asana Rebel's enrollment process during the Class Period (*see infra* ¶ 95), and that Plaintiff used in January 2024, was materially similar to the Asana Rebel page reproduced below:



40.     This page appears to present two offers for Asana Rebel: one for "12 MONTHS" of "unlimited access to all Asana Rebel Content" and another for "1 MONTH" of such access. Asana Rebel presents its plans to consumers considering a purchase as if they were time-limited, rather than renewing automatically. For example, a reasonable consumer choosing between the plans shown above would understand Asana Rebel to be offering a time-limited, one year plan for

a discounted price of $35.99, billed at $2.99 per month. In reality, a consumer who purchased that plan must pay the full $35.99 up front for a year of access to Asana Rebel, followed by automatic and indefinite yearly renewals at some undisclosed future renewal price, unless they cancelled.

41.     Nowhere on this page does Asana Rebel disclose that its offered subscriptions automatically renew for another full term until the consumer cancels, let alone the time frame in which the consumer must cancel to avoid a renewal charge or the amount of that charge. Indeed, the only wording that would even suggest the existence of such terms (i.e., "Billed annually at $71.99," in small, light green, unbolded text on the white background) *is crossed out*.

42.     That the page features a prominent, brightly colored "SUBSCRIBE NOW" button above the statement that "You can cancel your subscription anytime" (in far smaller, gray font) does nothing to disclose the terms of Asana Rebel's automatic renewal offer. Instead, it reinforces the reasonable assumption created by the prominently advertised per month price to the button's left: that the consumer will be billed monthly and can terminate their access to Asana Rebel "anytime" during the time-limited subscription.

43.     After selecting a plan, the consumer is redirected to Asana Rebel's payment page, where the consumer must select a payment method. When a consumer selects a payment method on the payment screen (*e.g.*, credit card, PayPal, etc.), the payment method box expands, as reproduced on the following page:

15

**Select payment method**

Secure Payment

All transactions will be processed over an SSL-encrypted connection

14-day money back guarantee

Write to customer support within 14 days, for a full refund.

**Credit/Debit Card**          VISA  MasterCard  AmEx  Discover

Name

| First name | Last name |

Credit card number

| •••• •••• •••• ••••  MM / YY CVV |

Billing Info

| United States ▾ | ZIP / Postal code |

PayPal          *P* PayPal

Buy with G Pay

Pay with ❯ link

I have a coupon code.

Order Summary

**Full access to:**
Workouts, Nutrition, Music for Focus

**Duration**
12 months

**Will be renewed on:**
July 17, 2026
You can cancel any time up until one day before the next renewal.

~~$71.99 this year~~
First year special offer: $35.99

**SUBMIT PAYMENT**

44.     The terms and conditions of Asana Rebel's automatic renewal offer are not presented clearly and conspicuously on this page. Indeed, the page largely confirms the misrepresentation imparted on the prior page: that the consumer is signing up for a fixed "duration" plan of 12 months at heavily discounted "special offer" price. The only (inadequate) "disclosures" are sandwiched midway through the Order Summary box, which otherwise contains information from the plan selection page (*i.e.*, consumers will have "full access" to Asana Rebel benefits for a set "duration" at a "special offer" price).

16

45.     Asana Rebel takes pains to make it unlikely that consumers will see and understand these supposed automatic renewal disclosures. A portion of the "disclosure" regarding cancellation is colored light gray rather than a more conspicuous color and is not set off from the surrounding text of the same size by symbols or other marks in a manner that clearly calls attention to the language; it is also notably smaller than prominent elements like the large bright green "Submit Payment" button. Even the bolded language "Will be renewed on" (which conveys only a tiny fraction of the terms required to be clearly and conspicuously presented under the Illinois ARL) itself blends into its surroundings, featuring the same formatting as two other blocks of information presented above it and appearing far less conspicuous than the larger, bolded, green font conveying the "special offer" below it.

46.     Asana Rebel's intentional design choices violate the Illinois ARL. *See* 815 ILCS § 601/10 (requiring companies like Asana Rebel to "disclose the automatic renewal offer terms clearly and conspicuously"); *see also* 815 ILCS § 601/5 ("'Clear and conspicuous' means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language.").

47.     The payment page's overall design and features *deemphasize* the notice text rather than make it **<span style="color:red">conspicuous</span>**. Asana Rebel's design choices make it unlikely reasonable consumers will even see the supposed "disclosures," which are scattered across different locations on the payment page, with some portions in a light gray font against a white background, which makes the "disclosures" difficult to read. Asana Rebel also does not provide a link to its automatic renewal terms anywhere on the plan selection or payment pages.

48.     Defendant's fine print also fails to clearly disclose key details about Asana Rebel's subscription practices, including its cancellation policy. Rather than state that a consumer's plan will automatically renew at a given price unless cancelled by a specific timeframe, Asana Rebel splits these elements up, forcing the consumer who has already selected a time-limited plan to piece them together.

49.     Moreover, any supposed "disclosures" on the Asana Rebel payment page are overshadowed by the page's other components in a clear demonstration of the "Misinformation" dark pattern. Asana Rebel's payment page uses at least 10 different colors, presents information in differently sized fonts and in various boxes, and includes hyperlinks, drop-down menus, and 6 different logos. The automatic renewal terms are split up, displayed in colors that are difficult to discern and that do not stand out from the surrounding text, and are easy to miss due to their minuscule size.

50.     Asana Rebel's "Order Summary" box likewise does not sufficiently present the terms and conditions of its automatic renewal offer to consumers, nor does it present the consumer with Asana Rebel's cancellation procedure.

51.     Moreover, any purported "disclosures" on Asana Rebel's prior plan selection page are not in visual proximity to the "Submit Payment" button on the payment page.

52.     In sum, Asana Rebel's payment page does not clearly and conspicuously disclose the terms of its automatically renewing subscription. In addition, during the Class Period, Asana Rebel failed to obtain consumers' affirmative consent to the automatic renewal terms and contains no mechanism for affirmatively consenting to the automatic renewal terms. *See* 815 ILCS § 601/10 (a)(ii) ("Any person, firm, partnership, association, or corporation that sells or offers to sell any products or services to a consumer pursuant to a contract, where such contract automatically

renews unless the consumer cancels the contract, shall . . . not charge the consumer's credit or debit card or other payment mechanism for an automatic renewal service without first obtaining the consumer's consent to the contract containing the automatic renewal offer terms."); *id.* § 601/10 (a)(i) (requiring terms to be clearly and conspicuously place "in visual proximity . . . to the request for consent to the offer").

53.     Nowhere on the payment page does Asana Rebel disclose critical information regarding cancellation, such as adequate instructions on how to cancel the Asana Rebel Subscription and/or turn off autorenewal, and Asana Rebel certainly does not clearly and conspicuously disclose how to do so in a manner that is capable of being retained by the consumer. This too violates the Illinois ARL. *See* 815 ILCS 601/10(a)(i) (requiring companies like Asana Rebel to disclose the "automatic renewal offer terms," including information regarding cancellation, clearly and conspicuously before a subscription is fulfilled).

54.     After a consumer has enrolled in an Asana Rebel Subscription, Asana Rebel sends them an email with the subject line "Welcome to Asana Rebel!" An example of the acknowledgement email is shown on the following page:

55.     Asana Rebel's post-enrollment acknowledgement email does not meet the Illinois ARL's post-purchase requirements. It does not provide "the automatic renewal offer terms, cancellation policy, and information regarding how to cancel" for Asana Rebel Subscriptions at all, let alone "in a manner that is capable of being retained by the consumer." ILCS 601/10(a)(iii).



56.     Although Asana Rebel's acknowledgment email purports to contain a link to the Company's "cancellation policy," the hyperlinked page does not provide any information on Asana Rebel's "policy" at all. Instead, it provides instructions for how to cancel, and *only* for those

consumers who signed up for Asana Rebel through the Apple or Google Play stores. For all other consumers, they must click yet another link to contact the Company's customer service department. On information and belief, for those consumers who do manage to contact customer service, Asana Rebel actively seeks to prevent cancellation.

57. Thus, Asana Rebel's acknowledgement email does not include a "cost-effective, timely, and easy-to-use mechanism for cancellation" that is described in the acknowledgement email. *Id.* § 601/10(a)(iii); § 601/10(b-5).

**C.** **Asana Rebel's Cancellation Process Violates the Illinois ARL**

58. Asana Rebel's cancellation process is not simple, cost-effective, timely, or easy-to-use. Asana Rebel also does not provide details about its subscription cancellation process that are capable of being retained by consumers. Instead, Asana Rebel employs the "roach motel" dark pattern strategy: it is easy to get into an Asana Rebel Subscription, but hard to get out.

59. Asana Rebel buries its cancellation mechanism. Although consumers are required to cancel through Asana Rebel's website, there is no account page or user portal accessible from the Company's website. Consumers must therefore search for and find out on their own how to cancel an Asana Rebel subscription.

60. On information and belief, the only way for consumers to access Asana Rebel's offerings is through the Company's mobile application, which intentionally hides and de-emphasizes the option to cancel autorenewal. For those consumers who manage to find cancellation in the app, they are redirected to Asana Rebel's website to complete the process.

61. The mobile application shows three tabs at the bottom, labeled "Today," "Explore," and "Activity." None of these options indicate that consumers should be able to access their account and subscription information in the tab. An exemplar of the mobile application home screen is reproduced on the following page:



62. First, consumers must first figure out on their own to navigate to the "Activity" tab. But even then, there is no text for the consumer's account or subscription settings. Instead, the second hidden step to cancel is navigating to a light gray gear icon on a lighter gray background, stashed in the upper right corner, as shown in the screenshot on the following page:



63.     Third, those consumers who have managed to find the hidden "Settings" page under the gear icon, are presented with a list of options to choose from, including "Subscription."

64.     Fourth, the "Subscription" page contains a de-emphasized link with light gray text on a white background reading "Cancel Subscription."



65.     Fifth, consumers who find and click on the "Cancel Subscription" link are taken to Asana Rebel's website. To cancel, consumers must know to click "Subscription Management," which presents customers with additional buttons including "Cancellation" and "Cancellation and Refund."

66.     Sixth, consumers must click "Cancellation" or "Cancellation and Refund" button to proceed to the next step.

67.     Seventh, the Company then requires consumers to login to their account again, even though they are logged in through the application on their smart phone, which fits into the "roadblock" dark pattern.

68.     Eighth, consumers must then fill out a form requiring them to populate a "Subject" and "Description" of their request, even though the Company automatically generates a "Reason" of "I would like to cancel my subscription[.]" Only after completing the eighth step of filling out this form is the Asana Rebel Subscription finally canceled.

69.     Asana Rebel's lengthy cancellation process is not "cost-effective, timely, and easy-to-use" and violates the Illinois ARL. ILCS 601/10(b-5). Indeed, even without the numerous steps that precede it, the cancellation form that is the final step of the process violates the Illinois ARL: it does not allow the consumer to cancel, but merely allows them to make a "request" to do so, and further requires them to justify that "request," rather than offering "a termination email formatted

and provided by the business that a consumer can send to the business ***without additional information***[.]" *Id.* (emphasis added).

70.    In sum, Asana Rebel's cancellation process is specifically and intentionally designed to thwart cancellation—a "roach motel" dark pattern—that prevents consumers from finding and canceling autorenewal. This "roach motel" dark pattern is made more effective—and thus more frustrating to the consumer's purpose—through Asana Rebel's willful deployment of additional dark patterns, including roadblocks and deliberate misdirection. Asana Rebel's cancellation process violates the ARL because it is not cost-effective, timely, or easy-to-use. ILCS 601/10(b), (b-5).

71.    Asana Rebel also does not provide consumers with a toll-free telephone number or electronic mail address for consumers to cancel the automatic renewal. *Id.*

**D.    Asana Rebel Fails to Send Notices of Upcoming Renewals that Comply with the Illinois ARL**

72.    Under the Illinois ARL, Asana Rebel must provide notice of an upcoming autorenewal to users with a 12 month or longer plan "no less than 30 days and no more than 60 days before the cancellation deadline." ILCS 601/10(b). That notice must "clearly and conspicuously, in a retainable form" disclose that (i) the consumer's Asana Rebel subscription will automatically renew unless cancelled; (ii) the cancellation mechanism, "which shall be offered in a manner in which the consumer commonly interacts with the business;" and (iii) the "deadline by which the consumer must cancel in order to avoid being charged for a subsequent term."

73.    During the time that Plaintiff was an Asana Rebel customer and during the class period defined herein, *see infra* ¶ 95, counsel's investigation shows that Asana Rebel may have failed to send consumers a compliant notice of the upcoming renewal, including, upon information

and belief, by failing to send any notice whatsoever or by sending only in-app (not email) notifications.

74.     Indeed, in response to online complaints about Asana Rebel's automatic renewal practices, the company appears to concede it does not send a reminder email, instead falling back on its inadequate sign-up disclosures as justification for its practices:[31]

---

[31] https://www.trustpilot.com/reviews/68922d635a8a3f4aa54fa839.



**E.** **How Asana Rebel's Subscription Scheme Injured Plaintiff**

75.     Plaintiff was injured by Asana Rebel's unlawful and deceptive subscription scheme because had Plaintiff known that she was enrolling in an automatically renewing subscription, she would not have enrolled in an Asana Rebel Subscription.

76.     On approximately January 15, 2024, Plaintiff enrolled in a one-year subscription to Asana Rebel for $35.99.

77. Plaintiff decided she did not want to continue with Asana Rebel after her one-year plan ended.

78. Having decided not to continue with Asana Rebel, Plaintiff believed that once her plan period was over, she would no longer be an Asana Rebel customer. Indeed, Plaintiff never expected to pay Asana Rebel anything beyond what she had already paid in January 2024 because Asana Rebel did not adequately disclose to Plaintiff that it would charge non-refundable recurring annual fees after her one-year subscription ended.

79. Nonetheless, on or about January 14, 2025, Asana Rebel charged Plaintiff's credit card $71.98 without her knowledge or permission for a one-year Asana Rebel subscription set to begin on or about January 15, 2025.

80. After the unauthorized charge to Plaintiff's credit card in January 2025, Plaintiff searched for information on the internet about how to cancel the unauthorized subscription but was unable to do so. Automatic renewal was only turned off for Plaintiff's account after Plaintiff contacted Asana Rebel to dispute the unauthorized charge.

81. Asana Rebel did not "clearly and conspicuously" disclose to Plaintiff that it would automatically renew her Asana Rebel Subscription for a one-year term after her one-year plan expired, or the amount that it would charge Plaintiff for this renewal. This information is not clearly and conspicuously provided in the contract offers made on Asana Rebel's website, in any hyperlinked terms on the website, or in any post-purchase acknowledgement or receipt email.

82. Similarly, Asana Rebel did not "clearly and conspicuously" disclose to Plaintiff how she could cancel her Asana Rebel Subscription. This information is not clearly and conspicuously provided in the contract offers made on Asana Rebel's website, in any hyperlinked terms on the website, or in any post-purchase acknowledgement or receipt email. Moreover,

Plaintiff has been unable to locate any email from Asana Rebel notifying her of an upcoming renewal.

83.  Plaintiff did not authorize or want her Asana Rebel Subscription to renew.

84.  Plaintiff was injured when Asana Rebel charged her credit card $71.98 for an Asana Rebel Subscription she did not want and did not want to pay for.

85.  Plaintiff was further injured by Asana Rebel's subscription scheme because had she known the truth about Asana Rebel's intentionally misleading subscription practices, she would not have enrolled in an Asana Rebel Subscription.

86.  Plaintiff intends to purchase products and services in the future for herself from health and lifestyle companies, including Asana Rebel, as long as she can gain some confidence in Asana Rebel's representations about its products and services and subscription practices, including autorenewal and cancellation. Moreover, Asana Rebel still has Plaintiff's payment information and could use it to process unauthorized payments in the future.

87.  Given that Asana Rebel has engaged in a series of deceptive acts and omissions for which it billed consumers and for which consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of Asana Rebel's last wrongful act against Plaintiff, which was in January 2025, when Asana Rebel last charged Plaintiff for an automatically renewing subscription she did not want and did not want to pay for.

88.  Asana Rebel deceived Plaintiff into believing that once her one-year plan period was over, she would no longer be subscribed to Asana Rebel.

## RULE 9(B) ALLEGATIONS

89.  To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

90. **WHO**: Defendant sells services to consumers in Illinois through a deceptive subscription scheme by making the material misrepresentations and omissions alleged in detail above in violation of consumer protection statutes and the common law, including with respect to automatic renewal and cancellation, leaving many consumers who sign up for an Asana Rebel product offering paying for illegal subscriptions.

91. **WHAT**:

- Asana Rebel conducts its deceptive subscription scheme by failing to clearly and conspicuously disclose the Company's terms and conditions to customers, including how to cancel a subscription. For example, instead of clearly explaining to the consumer what they are actually getting into, Asana Rebel offers consumers what appear to be time-limited plans and withholds the relevant (and inadequate) terms that reveal otherwise. Asana Rebel forces customers to click through over 30 screens prior to its purported (and inadequate) "disclosure" regarding its recurring fees displayed in a manner that customers are intended to overlook. Instead of alerting consumers to obtain their informed and affirmative consent to automatic renewal prior to charging their payment cards or third-party payment accounts, Asana Rebel hides the truth.

- Asana Rebel conducts its deceptive subscription scheme by failing to clearly and conspicuously disclose how to cancel an Asana Rebel Subscription in both its signup process and its acknowledgement emails sent to consumers.

- Asana Rebel conducts its deceptive subscription scheme by subjecting Asana Rebel customers to an exceedingly difficult cancellation process that requires consumers to figure out—on their own—that canceling requires navigating an unnecessarily long and intentionally confusing process that requires at least eight separate actions across at least six different pages and allowing consumers to only "request" cancellation, provided they fill out a form justifying their request. Asana Rebel's cancellation process is intentionally difficult to navigate and complete, and is designed to trap consumers into paying for illegally recurring Asana Rebel Subscriptions.

92. **WHERE**: Asana Rebel's deceptive and unlawful subscription scheme is conducted through its website, mobile/tablet/desktop apps, and electronic communications with customers.

93.     **WHEN**: Asana Rebel has been engaging in its deceptive and unlawful subscription scheme for years, and the scheme is ongoing. For a specific example, Asana Rebel used its deceptive and unlawful subscription practices scheme when Plaintiff first enrolled in an Asana Rebel Subscription in January 2024, through Asana Rebel's acknowledgment and receipt emails sent to Plaintiff, and Plaintiff's unsuccessful attempt to cancel her Asana Rebel Subscription after learning that Asana Rebel had charged her for an unwanted automatic renewal in January 2025. Asana Rebel uses the same or substantially similar deceptive and unlawful subscription practices scheme for all of its customers.

94.     **WHY**: Asana Rebel uses its deceptive and unlawful subscription scheme in order to trap Asana Rebel customers into paying for Asana Rebel Subscriptions. As a direct result of this scheme, Defendant has successfully reaped tens of millions in unlawful charges at the expense of unsuspecting customers.

95.     **HOW**: Asana Rebel conducts its deceptive and unlawful practices scheme by making the material misrepresentations and omissions in violation of consumer protection law and the common law alleged in detail above.

## CLASS ACTION ALLEGATIONS

96.     Plaintiff brings this action on her own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class that is preliminarily defined as all Asana Rebel customers in Illinois (including customers of companies Asana Rebel acts as a successor to) who were automatically enrolled into and charged for at least one month of Asana Rebel membership by Defendant at any time from the applicable statute of limitations period to the date of judgment (the "Class").

97.     As alleged throughout this Complaint, the Class's claims all derive directly from a single course of conduct by Defendant. Defendant has engaged in uniform and standardized

conduct toward the Class and this case is about the responsibility of Defendant, at law and in equity, for their knowledge and conduct in deceiving their customers. Defendant's conduct did not meaningfully differ among individual Class Members in its degree of care or candor, its actions or inactions, or in its false and misleading statements or omissions. The objective facts on these subjects are the same for all Class Members.

98. Excluded from the Class are: Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant. Also excluded are federal, state and local government entities; and any judge, justice, or judicial officer presiding over this action and the members of their immediate families and judicial staff.

99. Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add Subclasses, when Plaintiff files her motion for class certification.

100. Plaintiff does not know the exact size of the Class since such information is in the exclusive control of Defendant. Plaintiff believes, however, that the Class encompasses thousands of consumers whose identities can be readily ascertained from Asana Rebel's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

101. The Class is ascertainable because its members can be readily identified using data and information kept by Defendant in the usual course of business and within their control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

102.    Plaintiff is an adequate class representative. Plaintiff's claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiff and the other members of the Class were subject to the same or similar conduct engineered by Defendant. Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

103.    Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent her interests and those of the Class.

104.    Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

   a.   Whether Defendant's conduct violates the Illinois ARL;

   b.   Whether Defendant's conduct violates the applicable Illinois consumer protection statutes;

   c.   Whether Defendant's conduct violates the applicable common law doctrines;

   d.   Whether Defendant was unjustly enriched as a result of its conduct;

   e.   Whether Class Members have been injured by Defendant's conduct;

   f.   Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

   g.   The extent of class-wide injury and the measure of damages for those injuries.

105.    A class action is superior to all other available methods for resolving this controversy because: (1) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; (2) the prosecution of separate actions by

Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendant's conduct; (3) Defendant has acted or refused to act on grounds generally applicable to all Class Members; and (4) questions of law and fact common to the Class predominate over any questions affecting only individual Class Members.

106. Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

    a. Whether Defendant's conduct violates the Illinois ARL;

    b. Whether Defendant's conduct violates the applicable Illinois consumer protection statutes;

    c. Whether Defendant's conduct violates the applicable common law doctrines;

    d. Whether Defendant was unjustly enriched as a result of its conduct;

    e. Whether Class Members have been injured by Defendant's conduct; and

    f. Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices.

107. Accordingly, this action satisfies the requirements set forth under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

## COUNT I

### ILLINOIS AUTOMATIC CONTRACT RENEWAL ACT, 815 ILCS 601/1 *et seq.*

108. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

109. Plaintiff brings this claim on her own behalf and on behalf of each member of the Class.

110. Under the Illinois ARL, companies that sell or offer to sell any products or services to a consumer pursuant to a contract that automatically renews unless the consumer cancels the contract are required to disclose the automatic renewal offer terms clearly and conspicuously in

the contract before the subscription or purchasing agreement is fulfilled and in visual proximity to the request for consent to the offer, and to not charge consumers for any payments in connection with such a contract without first obtaining the consumer's consent. 815 ILCS 601/10(a)(i)–(ii).

111. The Illinois ARL requires that any covered entity provide a toll-free telephone number, electronic mail address, a postal address if the seller directly bills the consumer, or another cost-effective, timely, and easy-to-use mechanism for cancellation. 815 ILCS 601/10(b-5).

112. Asana Rebel violated the Illinois ARL as described in detail above, by:

    a. Failing to clearly and conspicuously disclose the automatic renewal terms before the subscription was fulfilled;

    b. During the Class Period, failing to obtain consumers' affirmative consent to the automatic renewal offer terms before charging consumers for Asana Rebel Subscriptions;

    c. During the Class Period, failing to provide an acknowledgement that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel;

    d. Failing to provide a cost-effective, timely, and easy-to-use mechanism for cancellation; and

    e. During the Class Period, failed to send consumers statutorily required notice of upcoming renewals.

113. Plaintiff and Class Members suffered monetary damages as a result of Defendant's conduct.

114. Defendant is liable to Plaintiff and Class Members for actual damages sustained.

## COUNT II

## ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

115. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

116. Plaintiff brings this claim on her own behalf and on behalf of each member of the Class.

117.    815 ILCS § 505/1 *et seq.* (the "ICFA") prohibits "unfair methods of competition and unfair or deceptive acts or practices," including "any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

118.    Asana Rebel committed unlawful practices under the ICFA because violations of the Illinois ARL constitute unlawful practices under the ICFA. 815 ILCS § 601/15.

119.    Asana Rebel committed unfair and/or deceptive practices under the ICFA because it imposed charges without complying with all applicable requirements of 815 ILCS § 601/1 *et seq.*, as alleged above.

120.    The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous.

121.    Defendant's actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and Class Members.

122.    As a result of Defendant's unlawful, unfair, and deceptive business practices, Plaintiff and Class Members suffered monetary damages.

123.    Plaintiff and Class Members seek relief under 815 ILCS § 505/10a, including, but not limited to injunctive relief, damages, restitution, punitive damages and attorneys' fees and costs.

## COUNT III

## CONVERSION

124.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

125.    Plaintiff brings this claim on her own behalf and on behalf of each member of the Class.

126.    Plaintiff and the Class own and have a right to possess the money that is in their respective bank accounts, internet payment accounts, and/or credit cards.

127.    Defendant substantially interfered with Plaintiff's and the Class's possession of this money by knowingly and intentionally making unauthorized charges to their bank accounts, internet payment accounts, and/or credit cards for Asana Rebel Subscriptions.

128.    Plaintiff and the Class never consented to Defendant's taking of this money from their bank accounts, internet payment accounts, and/or credit cards.

129.    Defendant wrongfully retained dominion over this monetary property and/or the time-value of the monetary property.

130.    Plaintiff and the Class have been damaged by Defendant's wrongful taking and/or possession of such money from their bank accounts, internet payment accounts, and/or credit cards in an amount that is capable of identification through Defendant's records.

131.    By reason of the foregoing, Defendant is liable to Plaintiff and the Class for conversion in an amount to be proved at trial.

## COUNT IV

### UNJUST ENRICHMENT

132.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

133.    Plaintiff brings this claim on her own behalf and on behalf of each member of the Class.

134.    As a result of their unjust conduct, Defendant has been unjustly enriched.

135.    By reason of Defendant's wrongful conduct, Defendant has benefited from receipt and maintenance of improper funds, and under principles of equity and good conscience, Defendant should not be permitted to keep this money.

136.    As a result of Defendant's conduct, it would be unjust and/or inequitable for Defendant to retain the benefits of its conduct without restitution to Plaintiff and the Class. Accordingly, Defendant must account to Plaintiff and the Class for its unjust enrichment.

## COUNT V

## MONEYS HAD AND RECEIVED

137.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

138.    Plaintiff brings this claim on her own behalf and on behalf of each member of the Class.

139.    Defendant received moneys from Plaintiff and from each member of the Class.

140.    The moneys belong to Plaintiff and each member of the Class.

141.    Defendant has not fully returned the moneys.

142.    Plaintiff, on behalf of herself and the members of the Class, seeks the return of the moneys in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)    Issue an order certifying the Class defined above, appointing Plaintiff as the Class representative, and designating Wittels McInturff Palikovic as Class Counsel;

(b)    Find that Defendant has committed the violations of law alleged herein;

(c)    Determine that Defendant has been unjustly enriched as a result of its wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Class;

(d)    Enter an order granting all appropriate relief including injunctive relief on behalf of the Class under the applicable laws;

(e)    Render an award of compensatory damages of at least $50,000,000, the exact amount of which is to be determined at trial;

(f)      Issue an injunction or other appropriate equitable relief requiring Defendant to refrain from engaging in the deceptive practices alleged herein;

(g)     Declare that Defendant has committed the violations of law alleged herein;

(h)     Render an award of punitive damages;

(i)      Enter judgment including interest,  reasonable attorneys' fees, costs, and expenses; and

(j)      Grant all such other relief as the Court deems appropriate.

Dated: August 29, 2025

**WITTELS MCINTURFF PALIKOVIC**

/s/ Daniel J. Kieselstein
Daniel J. Kieselstein
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Tel:     (914) 775-8862
djk@wittelslaw.com

*Counsel for Plaintiff and the Proposed Class*